STATE OF CONNECTICUT *v.* MICHAEL A. YOUNG
(SC 16339)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued May 31—officially released September 18, 2001

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, were *Patricia A. Swords*, state's attorney, and *Nina Rosen*, supervisory assistant state's attorney, for the appellant (state).

*Arthur L. Ledford*, certified legal intern, with whom was *Kent Drager*, senior assistant public defender, for the appellee (defendant).

*Opinion*

PALMER, J. Following a jury trial on three consolidated informations involving three separate incidents, the defendant, Michael A. Young, was found guilty of three counts of criminal violation of a protective order in violation of General Statutes (Rev. to 1995) § 53a-110b and General Statutes (Rev. to 1995) § 53a-110b, as amended by Public Acts 1995, No. 95-214, § 5,[1] and one count each of breach of the peace in violation of

---

[1] General Statutes (Rev. to 1995) § 53a-110b provides in relevant part: "(a) A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c has been issued against such person, and such person violates such order. . . ."

Public Acts 1995, No. 95-214, § 5, amended subsection (a) of § 53a-110b to include protective orders issued pursuant to General Statutes § 54-1k. The protective order that the defendant was found guilty of violating in the present case, however, was issued pursuant to General Statutes (Rev. to 1993) § 46b-38c (d).

General Statutes § 53a-181 (a) (2),[2] disorderly conduct in violation of General Statutes § 53a-182 (a) (1),[3] reckless endangerment in the second degree in violation of General Statutes § 53a-64[4] and criminal mischief in the third degree in violation of General Statutes § 53a-117 (a) (1) (A).[5] After the trial court rendered judgments[6] in accordance with the jury verdicts, the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court improperly had granted the state's motion for a missing witness instruction regarding the defendant's failure to produce an eyewitness to one of the three incidents, in accordance with *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960).[7] The Appellate Court concluded that: (1) this

[2] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . (2) assaults or strikes another . . . ."

[3] General Statutes § 53a-182 (a) provides in relevant part: "A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) Engages in fighting or in violent, tumultuous or threatening behavior . . . ."

[4] General Statutes § 53a-64 provides in relevant part: "(a) A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a risk of physical injury to another person. . . ."

[5] General Statutes § 53a-117 (a) provides in relevant part: "A person is guilty of criminal mischief in the third degree when, having no reasonable ground to believe that he has a right to do so, he: (1) Intentionally or recklessly (A) damages tangible property of another . . . ."

[6] The trial court sentenced the defendant to a total effective sentence of forty-four months imprisonment.

[7] "In *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 672, this court stated that [t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . Id., 675. This principle, previously articulated by this court in *Ezzo* v. *Geremiah*, 107 Conn. 670, 677, 142 A. 461 (1928), and subsequently approved for use in criminal cases; see *State* v. *Daniels*, 180 Conn. 101, 109, 429 A.2d 813 (1980); *State* v. *Annunziato*, 169 Conn. 517, 536–39, 363 A.2d 1011 (1975); commonly is referred to as the *Secondino* rule or the missing witness rule. Similarly, the jury charge explaining the rule commonly is referred to as the *Secondino* instruction or the missing

court's decision in *State* v. *Malave*, 250 Conn. 722, 738, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), in which we abandoned the *Secondino* rule in criminal cases, has retrospective applicability and, therefore, the missing witness instruction given by the trial court was improper; and (2) the impropriety constituted harmful error, thereby entitling the defendant to a new trial in connection with the charges stemming from the incident to which the *Secondino* charge related, namely, one count each of criminal violation of a protective order, breach of the peace, disorderly conduct, reckless endangerment in the second degree and criminal mischief in the third degree. *State* v. *Young*, 57 Conn. App. 566, 572–73, 750 A.2d 482 (2000). Thus, the Appellate Court reversed the trial court's judgment pertaining to the defendant's conviction on those charges but affirmed the two other judgments pertaining to the defendant's two other convictions for criminal violation of a protective order.[8] See id., 580–81.

The state sought certification to appeal from that portion of the Appellate Court's judgment reversing the trial court's judgment, claiming that the Appellate Court improperly had concluded that our decision in *Malave* should be applied retroactively. We granted the state's petition limited to the issue of whether *Malave* has retrospective applicability.[9] *State* v. *Young*, 253 Conn.

witness instruction. We use these terms interchangeably throughout this opinion." (Internal quotation marks omitted.) *State* v. *Woods*, 257 Conn. 761, 764 n.7, 778 A.2d 933 (2001).

[8] The defendant filed a petition for certification to appeal from that portion of the Appellate Court's judgment affirming the trial court's judgments. That petition, however, was denied; *State* v. *Young*, 253 Conn. 922, 754 A.2d 799 (2000); and, consequently, the defendant's two other convictions for criminal violation of a protective order are not at issue in this appeal.

[9] The state claims that, contrary to the conclusion of the Appellate Court, this court's decision to abolish the *Secondino* rule in criminal cases in *State* v. *Malave*, supra, 250 Conn. 738, does not apply retroactively. The defendant, on the other hand, contends that the Appellate Court properly concluded that our decision in *Malave* has retroactive applicability.

922, 754 A.2d 799 (2000). We do not decide this certified issue, however, because, even if we assume, as the state contends, that our decision in *Malave* should not be applied retroactively, we nevertheless conclude that the trial court abused its discretion in granting the state's motion for a *Secondino* charge[10] and, consequently, the charge should not have been given. We further conclude, however, that, contrary to the determination of the Appellate Court, the trial court's *Secondino* charge was harmless. We, therefore, reverse in part the judgment of the Appellate Court.

I

As we have indicated, the defendant was charged in connection with three separate incidents.[11] The first and third incidents, which occurred on August 4, 1995, and November 30, 1995, respectively, resulted in the defendant's arrest for one count of criminal violation of a protective order per incident. The second incident, which occurred on November 25, 1995,[12] resulted in the defendant's arrest for one count each of, inter alia, criminal violation of a protective order, breach of the peace, disorderly conduct, reckless endangerment in the first degree[13] and criminal mischief in the third

[10] Thus, whether our decision in *State* v. *Malave*, supra, 250 Conn. 738, should be applied retroactively is not determinative of this appeal. Rather, the dispositive issues are: (1) whether the trial court improperly granted the state's motion for a *Secondino* instruction; and (2) if so, whether the trial court's impropriety constituted harmful error.

[11] Each incident, and the charges stemming therefrom, formed the basis of a separate information and a separate judgment of conviction. The defendant has not challenged the consolidation of those three informations for trial.

[12] Although the charges arising from the events of November 25, 1995, involved two separate altercations, we refer to those events as the November 25, 1995 incident for ease of reference.

[13] The defendant was charged with reckless endangerment in the first degree. The jury, however, found the defendant guilty of the lesser included offense of reckless endangerment in the second degree. See footnote 4 of this opinion.

degree.[14] Although only the convictions stemming from the November 25, 1995 incident are the subject of this appeal, we also set forth the facts that the jury reasonably could have found in regard to the other two incidents because those facts are relevant to the issue of whether the improper *Secondino* charge was harmful. See part III of this opinion.

"On August 18, 1994, the court issued a protective order prohibiting the defendant from having any contact with the victim, Brandis Breedlove. The order remained in effect until January 11, 1996. The defendant was involved in three separate incidents . . . .

"The first incident occurred on August 4, 1995. The defendant knocked on Breedlove's door at approximately 1 a.m. Breedlove refused to let him into her home. The defendant then went to Breedlove's car and started pulling out wires from the engine. Breedlove told the defendant that she was going to call the police and the defendant left. Breedlove then called the police and reported the incident. Shortly thereafter, the defendant called Breedlove and inquired about the whereabouts of the police. Breedlove told him that the police had been called and were on their way.

"State Trooper Jack Richard Sauve arrived at the scene and began taking Breedlove's statement. The telephone rang and Breedlove answered. She told Sauve that the defendant was on the telephone and handed the telephone to him. Sauve said, 'Michael, this is Trooper Sauve. Where are you?' The defendant replied, 'I'm around. Why do you want to know?' At no point did the caller deny being the defendant. Initially, Breedlove did not sign the statement prepared by Sauve. Three weeks later she contacted Sauve and signed the state-

---

[14] The defendant also was charged with assault in the third degree and threatening in connection with the November 25, 1995 incident. The jury, however, found the defendant not guilty with respect to those charges.

ment, alleging that the defendant had continued to harass her.

"The second incident occurred on November 25, 1995. Breedlove and Robert Cormier were at a bar in Stafford [known as Munn's Pub]. As they were leaving, the defendant and a friend, Lanny Martin, arrived at the parking lot in the defendant's car. The defendant got out of the car, walked to Breedlove, spit on her, pushed her to the ground and then started fighting with Cormier. The fight was broken up by patrons of the bar. Breedlove and Cormier got into Breedlove's car and drove away.

"As they were driving home, Breedlove noticed that the defendant was following her. The defendant rammed his car into her car from behind five or six times at a speed of approximately forty-five miles per hour. Breedlove stopped her car and got out. The defendant and Martin got out of the defendant's car, and the defendant [approached] Cormier. Breedlove intervened and the defendant hit her with a closed fist. He then picked up Breedlove by her hair and dragged her down the road. While this was taking place, Martin held Cormier back by brandishing a broken beer bottle. Breedlove managed to get back into her car, at which point the defendant kicked in the driver's side window. Breedlove received cuts on her forehead, nose and lower lip. She also had bruises on her cheek and mouth from being hit, and was left with a bald spot where her hair was pulled out.

"The third incident occurred on November 30, 1995. The defendant telephoned Breedlove at home approximately fifteen times and drove by her home later that night. The defendant was charged in a separate information stemming from each incident."[15] *State* v. *Young*, supra, 57 Conn. App. 568–70.

[15] We note that the defendant testified in his own defense with respect to the incidents of November 25, 1995, and November 30, 1995. He, however,

After the court rendered judgments in accordance with the jury's verdicts, the defendant appealed from those judgments to the Appellate Court, claiming, inter alia, that the trial court had abused its discretion in granting the state's motion for a missing witness instruction with respect to the defendant's failure to call Martin as a witness to testify about the November 25, 1995 incident.[16] The Appellate Court did not address the mer-

invoked his fifth amendment privilege against self-incrimination with respect to the August 4, 1995 incident. The opinion of the Appellate Court incorrectly states that the defendant also invoked his privilege against self-incrimination in connection with the November 30, 1995 incident. *State* v. *Young*, supra, 57 Conn. App. 575.

[16] On appeal to the Appellate Court, the defendant also claimed that the trial court improperly had: (1) precluded evidence of the victim's prior misconduct; (2) admitted evidence of a telephone conversation without a proper evidentiary foundation; (3) precluded the defendant from impeaching the victim regarding an alleged act of fraud; and (4) allowed the state to cross-examine the defendant regarding certain prior acts of misconduct. *State* v. *Young*, supra, 57 Conn. App. 568. The Appellate Court rejected all but the last of these claims. Id., 576, 578, 580. With respect to the defendant's claim that the trial court improperly had permitted the state to cross-examine him regarding certain prior acts of misconduct, the Appellate Court declined to address that claim, concluding that the prior misconduct evidence related only to those charges stemming from the November 25, 1995 incident and, further, that the issue was unlikely to arise at a retrial on those charges. See id., 575. In view of our determination that the Appellate Court improperly concluded that the *Secondino* charge given by the trial court entitles the defendant to a new trial, the defendant's claim regarding the prior misconduct evidence must be addressed. Because of the limited nature of the certified issue in this case, the parties did not address the issue concerning the prior misconduct evidence in this court. Thus, the case must be remanded to the Appellate Court for consideration of that remaining issue.

It is also important to note that the Appellate Court's conclusion that the prior misconduct evidence related only to those charges stemming from the November 25, 1995 incident may have been based, at least in part, on its erroneous belief that the defendant testified only as to the November 25 incident and invoked his privilege against self-incrimination as to the incidents of August 4, 1995, and November 30, 1995. See footnote 15 of this opinion (noting that defendant invoked his privilege against self-incrimination only as to August 4 incident, and not as to November 30 incident). The trial court, in overruling defense counsel's objection to the state's cross-examination of the defendant regarding his prior acts of misconduct, concluded that the defendant opened the door to such cross-examination and

its of the defendant's *Secondino* claim but, rather, concluded that this court's decision in *State* v. *Malave*, supra, 250 Conn. 738, in which we abandoned the missing witness rule in criminal cases, applied retroactively to the present case,[17] and, further, that the instruction was harmful. *State* v. *Young*, supra, 57 Conn. App. 572–73. The Appellate Court, therefore, reversed the trial court's judgment of conviction arising from the November 25, 1995 incident. Id., 580. Although we do not decide the issue of whether *Malave* should be applied retroactively, we agree with the defendant that, under the circumstances presented, the state was not entitled to a *Secondino* instruction. We conclude, however, that the giving of that instruction was harmless.

## II

We first address the propriety of the trial court's decision to grant the state's motion for a missing witness instruction. The opinion of the Appellate Court sets forth the following additional facts that are necessary to our resolution of this issue. "The defendant and Martin were charged as codefendants as a result of the events that occurred on November 25, 1995. They were tried separately and, at the time of the defendant's trial, Martin's case was pending. At the defendant's trial, State Trooper Colleen Anuszewski testified that she had seen

stated that it would allow the state to use the prior misconduct evidence to shed light on the defendant's "credibility." It is indeed plausible that the jury might have viewed the prior misconduct evidence as casting doubt on the defendant's credibility in general and, because the defendant testified regarding the November 25 and November 30 incidents, the prior misconduct evidence may have contributed to the jury's decision to discredit the defendant's testimony regarding both the November 25 and November 30 incidents. Consequently, the Appellate Court's resolution on remand of the defendant's claim regarding the prior misconduct evidence may affect not only the trial court's judgment pertaining to the November 25 incident but, also, the trial court's judgment of conviction of criminal violation of a protective order arising out of the November 30 incident.

[17] This court decided *Malave* during the pendency of the defendant's appeal of the present case to the Appellate Court. See *State* v. *Young*, supra, 57 Conn. App. 571.

Martin the day before and that he could be located in Hartford. On cross-examination, the defendant testified that Martin was a friend and the defendant knew where he could be located.

"At the close of all of the evidence but prior to summation, the state filed a request for a *Secondino* . . . instruction to be given to the jury. The defendant objected and made an offer of proof outside the presence of the jury. Defense counsel offered the testimony of Phillip N. Armentano, an attorney for Martin in his pending criminal trial. Armentano testified that if Martin were to take the witness stand, he would advise him to invoke his fifth amendment privilege against self-incrimination. The court concluded that the privilege was personal to Martin and overruled the [defendant's] objection. The court found that Martin was available and that he was a witness whom the defendant naturally would be expected to call to testify. The court refused to speculate as to whether Martin would invoke his fifth amendment privilege and granted the state's request for the *Secondino* instruction."[18] Id., 571.

"Prior to the issuance of our opinion in [*State* v. *Malave*, supra, 250 Conn. 722], we had permitted missing witness instructions in certain circumstances. We

___

[18] In anticipation of the court's *Secondino* instruction, the assistant state's attorney stated during closing arguments: "I ask you, ladies and gentlemen, where is Lanny Martin? . . . Martin was the other person that was at that scene, and he is a friend of this [defendant]. Why isn't he here to testify? Why didn't the defendant call him and put him on the stand? Why do you think, ladies and gentlemen, that didn't happen? . . . [W]here is . . . Martin to confirm all this, I would like to know. Where is he? He is [the defendant's] friend."

The assistant state's attorney made the following additional comments during her rebuttal argument: "And once again, I ask you, where is Lanny Martin, [the defendant's] friend . . . who was there and saw everything? He was holding the . . . broken bottle to [Cormier]. . . . Why isn't he here to testify to tell us what happened? He is [the defendant's] friend, and the state is not only relying on . . . Breedlove's testimony. The state has . . . Cormier's testimony."

recently summarized our pre-*Malave* missing witness jurisprudence as follows: The failure to produce a witness for trial who is available and whom a party would naturally be expected to call warrants an adverse inference instruction against the party who would be expected to call that witness. . . . [T]he two requirements for a *Secondino* adverse inference instruction against a party are that the witness: (1) is available; and (2) could reasonably be expected, by his [or her] relationship to the party or the issues, to have peculiar or superior information material to the case that, if favorable, the party would produce. . . . The party seeking the adverse inference instruction bears the burden of proving both prongs of the test, and the trial court must make a preliminary determination that there is evidence in the record to support these elements. . . .

"Whether a party has established the requirements for a *Secondino* instruction is a factual determination that is committed to the sound discretion of the trial court. . . . We will not disturb that discretion unless the failure to give such an instruction amounts to a clear abuse of that discretion. . . . *State* v. *Lewis*, 245 Conn. 779, 813–14, 717 A.2d 1140 (1998)." (Citations omitted; internal quotation marks omitted.) *State* v. *Woods*, 257 Conn. 761, 767–68, 778 A.2d 933 (2001). Under *Secondino*, therefore, it was the state's burden to establish, first, that the missing witness, Martin, was available to testify.

The defendant contends that Martin was unavailable to testify because, if called, Martin almost certainly would have invoked his fifth amendment privilege against self-incrimination. The defendant bases his contention on the following facts: (1) Martin, himself, had pending charges arising from the November 25, 1995 incident at the time of the defendant's trial; (2) Martin's attorney, Armentano, testified that he would have

advised Martin to exercise his constitutional privilege against self-incrimination if Martin had been called to testify; and (3) Martin had a compelling reason to accept his attorney's advice in light of the pending charges. The state claims that, because the constitutional privilege against self-incrimination is a personal one, only the witness, himself, can invoke it, and, consequently, the court reasonably refused to assume that Martin, who physically was available, would have declined to testify by exercising his privilege against self-incrimination. We agree with the defendant.[19]

There can be no doubt that a witness who, like Martin, has pending criminal charges, generally will be well advised to invoke his privilege against self-incrimination to avoid subjecting himself to examination under oath in advance of his own trial. This is especially true when, as in the present case, the charges pending against the witness stem from the very same incident that would be the subject of the witness' testimony if he were to agree to testify. It, therefore, would have been highly unusual if Martin's attorney did *not* indicate that he intended to advise Martin to invoke his privilege against self-incrimination if the defendant called Martin as a witness. Under the circumstances, there is scant reason to think that Martin would have agreed to testify in this case notwithstanding his attorney's advice to the contrary.[20]

The state relies on *State* v. *Cecarelli*, 32 Conn. App. 811, 631 A.2d 862 (1993), in support of its contention that the trial court did not abuse its discretion in concluding that the state had satisfied its burden of showing

---

[19] The state does not dispute that Martin, although physically available, would have been unavailable for *Secondino* purposes if he personally had invoked his privilege against self-incrimination.

[20] Thus, as the Appellate Court observed, "it is highly unlikely that the defendant could have obtained Martin's testimony because of his fifth amendment privilege . . . ." *State* v. *Young*, supra, 57 Conn. App. 575.

that Martin was available to testify for the defendant. In *Cecarelli*, the Appellate Court held that the trial court erred when it failed to conduct a hearing to determine whether a witness would invoke his privilege against self-incrimination instead of relying on the testimony of the witness' attorney that his client would invoke that privilege. Id., 818–19. Although we agree with the state that the court in *Cecarelli* was correct in characterizing the privilege against self-incrimination as a personal one; see id., 818; *Cecarelli* did not involve the invocation of that privilege in the context of determining whether a missing witness instruction was unwarranted on the basis of the witness' unavailability.

In *Cecarelli*, the defendant, John Cecarelli, sought to call a witness, Anthony Gentile, who, after his arrest on narcotics charges, agreed to cooperate with the police. Id., 813. Thereafter, Gentile, at the behest of the police, purchased narcotics from Cecarelli, who, following his arrest for that sale, claimed entrapment by the police. Id., 816. To support his entrapment defense at trial, Cecarelli attempted to call Gentile as a witness. Id., 817. Gentile's attorney informed the court, however, that, if called, Gentile would exercise his privilege against self-incrimination. Id. The trial court accepted counsel's representation and, over the defendant's objection, declined to conduct a hearing at which Gentile personally could be questioned, outside the presence of the jury, as to whether, in fact, he would invoke his privilege against self-incrimination. Id., 817–18. In concluding that the hearing was necessary, the Appellate Court noted not only that the privilege against self-incrimination is personal to the witness but, in addition, that Cecarelli might have had a bona fide claim that, under the circumstances, Gentile's constitutional privilege simply did not pertain to some of the questions that Cecarelli might wish to ask him regarding the drug transaction. Id., 818–19.

We agree that, in circumstances such as those presented in *Cecarelli*, it is necessary for the court to conduct a hearing to determine whether a witness whom a party *seeks to call* is unavailable. Indeed, in that case, Cecarelli's ability to call Gentile as a witness implicated his constitutional right to present a defense, and it, therefore, was imperative that the court hear from Gentile, himself, regarding his decision to invoke his privilege against self-incrimination. The hearing also was necessary to ensure that Gentile's invocation of the privilege was proper. Such certainty regarding a witness' invocation of the privilege against self-incrimination is not nearly so important in the context of determining unavailability under the *Secondino* rule, however, because, with respect to the latter situation, neither the party seeking the *Secondino* instruction nor the party opposing the instruction is attempting to call the witness to testify; the issue, rather, is whether the jury may draw an adverse inference due to a party's *failure* to call a particular witness. Because "[t]he giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional [dimension]"; (internal quotation marks omitted) *State* v. *Malave*, supra, 250 Conn. 738; the defendant's right to present a defense is not implicated by a determination that, because there is a high likelihood that the witness will exercise his privilege against self-incrimination, a missing witness instruction is unwarranted.

This court previously has indicated that a witness need not personally invoke his privilege against self-incrimination to justify a finding of unavailability for *Secondino* purposes when, in light of all the facts, it nevertheless is apparent that the witness will refuse to testify.[21] See *State* v. *Rosa*, 170 Conn. 417, 430–31, 365

[21] Indeed, in abandoning the *Secondino* rule in criminal cases, we noted that a witness' probable invocation of his privilege against self-incrimination might constitute one of several justifications for not calling a witness who otherwise is available. *State* v. *Malave*, supra, 250 Conn. 734 n.13. In such circumstances, it simply is unfair for the court to invite the jury to draw

A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976) (trial court properly rejected defendant's request for missing witness instruction regarding state's failure to call defendant's accomplice as witness because, inter alia, it appeared from record that, if called, witness would invoke her privilege against self-incrimination unless state granted her immunity). Several other courts also have concluded that a witness' personal invocation of his privilege against self-incrimination is not a necessary prerequisite to a finding that the witness is unavailable when, as in the present case, it is quite clear that the witness, if called, will exercise that privilege. E.g., *United States v. Martin*, 526 F.2d 485, 487 (10th Cir. 1975); *Robinson v. State*, 315 Md. 309, 316, 554 A.2d 395 (1989); see *Lawson v. United States*, 514 A.2d 787, 792 (D.C. 1986); see also *State v. Cavness*, 46 Haw. 470, 473, 381 P.2d 685 (1963) (prosecutor improperly urged jury to draw unfavorable inference from defendant's failure to call accomplice). Because it virtually was certain that Martin would have invoked his privilege against self-incrimination and would have refused to testify if called by the defendant, we conclude that the trial court abused its discretion in granting the state's motion for a missing witness instruction regarding the defendant's failure to produce Martin.

### III

Our conclusion that the trial court abused its discretion in granting the state's motion for a missing witness instruction does not end our inquiry; we also must determine whether the impropriety was harmful, thereby entitling the defendant to a new trial on the charges stemming from the November 25, 1995 incident. "When an improper evidentiary ruling is not constitutional in

an inference, based solely upon a party's failure to produce the witness, that the testimony thereof would be unfavorable to that party.

nature, the defendant bears the burden of demonstrating that the error was harmful. As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. *State* v. *Shabazz*, 246 Conn. 746, 759, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. [E.g.] *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997); *State* v. *Wilkes*, 236 Conn. 176, 188, 671 A.2d 1296 (1996) . . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. See, e.g., *State* v. *Askew*, 245 Conn. 351, 371–72, 716 A.2d 36 (1998)." (Citations omitted; internal quotation marks omitted.) *State* v. *Marshall*, 246 Conn. 799, 812, 717 A.2d 1224 (1998). For purposes of the present case, we need not choose between the two formulations or decide whether there is any functional difference between them because, on the basis of our careful examination of the record, we conclude that the defendant has not satisfied his burden of proving harm under either formulation of the standard.

Breedlove and Cormier were the only eyewitnesses to testify for the state regarding the defendant's alleged criminal conduct and, therefore, they provided the key testimony against the defendant. Breedlove testified that the defendant repeatedly had continued to assault and otherwise harass her after the issuance of the protective order in August, 1994, and that the defendant's conduct on August 4, 1995, compelled her to contact the police. She also testified in detail regarding the events of November 25, 1995, and did not waver from her version of those events on cross-examination. She similarly was steadfast in her testimony regarding the

defendant's violation of the protective order on November 30, 1995. Cormier's testimony regarding the November 25, 1995 incident corroborated Breedlove's testimony in all material respects. Although a friend of Breedlove, Cormier had no apparent motive to fabricate a story about the events of November 25, 1995.[22]

To be sure, both Breedlove's and Cormier's testimony was not unimpeachable. In particular, Breedlove had given two written statements prior to the incident of November 25, 1995, in which she stated—falsely, according to her trial testimony—that the defendant never had harmed her. In Cormier's case, he testified that he was intoxicated when he left Munn's Pub in the early morning hours of November 25, 1995, and conceded that his powers of observation consequently were "not that good." Breedlove, however, explained that she had made those false statements because she was afraid of the defendant and because she hoped that, by doing so, he would leave her alone. Furthermore, although Cormier candidly admitted that he had been drinking heavily at Munn's Pub prior to the November 25, 1995 incident, he also testified that he had a clear recollection of those events.

Moreover, both Breedlove's and Cormier's testimony was corroborated by other witnesses. For example, with respect to the incident of August 4, 1995, State Trooper Sauve, who had been dispatched to Breedlove's residence at approximately 1 a.m., spoke to the defendant on the telephone when the defendant attempted to contact Breedlove. In addition, Sauve testified that Breedlove was frightened and upset, and that she became even more concerned after the defendant's telephone call. Finally, Sauve's testimony regarding what Breedlove had told him about the defendant's conduct

---

[22] Cormier, who indicated that he had dated Breedlove for a short time, testified that they were not romantically involved at the time of the trial.

on August 4, 1995, was consistent with Breedlove's testimony concerning the incident.

The testimony of Breedlove and Cormier regarding the incident of November 25, 1995, also was corroborated by State Trooper Anuszewski, who arrived at Breedlove's residence at approximately 3 a.m. in response to Breedlove's call to the police. Anuszewski interviewed Breedlove and Anuszewski's testimony about her investigation of the November 25, 1995 incident was consistent with Breedlove's testimony. Anuszewski observed that Breedlove's face was bruised and swollen, that her lip had been cut, that her hair had been pulled out, leaving a bald spot on the left side of her scalp, and that the driver's side window of Breedlove's car had been smashed. Anuszewski also observed scratches and scrapes on the car's rear bumper, which were consistent with Breedlove's explanation that the defendant repeatedly had rammed her car from behind. Anuszewski further noted that Breedlove appeared to be very "shaken" by the incident. According to Anuszewski, Cormier, who had accompanied Breedlove to her residence, also was upset by the events, but was "calm and very cooperative, and willing to assist in any way he could." Finally, Anuszewski, who traveled to the area where the defendant allegedly had smashed Breedlove's car window, found a substantial amount of broken glass in the roadway where Breedlove had indicated that it would be.

Finally, State Trooper Kevin Lyons testified that he had been dispatched to Breedlove's residence at approximately 2 a.m. on December 1, 1995. According to Lyons, Breedlove informed him that the defendant had been calling her and driving by her home on November 30, 1995. Lyons further testified that Breedlove

appeared to be "visibly shaken" by the defendant's persistent and menacing conduct.[23]

The defendant testified regarding the events of November 25 and 30, 1995. With respect to the second of these two incidents, the defendant denied that he had called Breedlove on the telephone on November 30 or that he had driven by her home. His version of the events of November 25, 1995, also was completely contrary to the evidence adduced by the state. Specifically, he claimed that Breedlove had approached him in the parking lot near Munn's Pub and, without provocation, proceeded to assault him. The defendant explained that Breedlove had attacked him because she was upset that he was romantically involved with someone else. The defendant also explained that he did not strike Breedlove but, rather, ran away to avoid any further conflict with Breedlove. According to the defendant, Martin, who was driving the defendant's car, picked him up shortly thereafter.

The defendant further testified that he and Martin were parked on the side of the road when Breedlove, accompanied by Cormier, drove past his car, pulled in front of him and stopped. According to the defendant, he got out of his car and walked over to Breedlove, who also had exited her vehicle. The defendant stated that he hugged Breedlove and told her that he loved her. The defendant testified that Breedlove initially was calm, but that she started hitting him again. According to the defendant, he endeavored to protect himself by repeatedly pushing Breedlove away, but, in doing so, accidentally knocked her to the ground. The defendant stated that when Breedlove got up, she went into her

---

[23] The state also presented the testimony of Evan Stark, an expert in the field of domestic violence, who testified about battered woman's syndrome. Stark's testimony regarding domestic violence tended to buttress Breedlove's credibility by explaining to the jury how women in Breedlove's circumstances frequently may respond to episodes of domestic violence.

car to retrieve a flashlight. Concerned that Breedlove was going to use the flashlight as a weapon against him, the defendant kicked her driver's side door closed and then returned to his vehicle and drove away to avoid any further trouble. The defendant testified that Breedlove, herself, inadvertently smashed the driver's side window of her vehicle with the flashlight that she had retrieved from her car.

On cross-examination, the defendant stated that Breedlove's physical attack against him "was her way of telling [him] she still loved [him]." He also stated that he frequently is falsely accused, and that the police have arrested him many times for no reason.

The state's case and the defendant's version of the events, therefore, were diametrically opposed. Consequently, the jury's primary task was to assess and determine the relative credibility of the state's witnesses, on the one hand, and the defendant, on the other hand. As its verdicts reflect, the jury credited the testimony of the state's witnesses. We do not believe that the improper *Secondino* instruction was likely to have affected the jury's credibility assessment.

Because Martin was not a witness to the incidents of August 4, 1995, and November 30, 1995, the improper *Secondino* charge related only to the incident of November 25, 1995. It is apparent that the jury, by virtue of its guilty verdict on the charge of criminal violation of a protective order arising out of the incident of August 4, 1995, credited Breedlove's testimony regarding that incident. As to the jury's finding of guilty of criminal violation of a protective order stemming from the incident of November 30, 1995, it is clear that the jury not only credited Breedlove, but also necessarily disbelieved the defendant's contradictory testimony. Inasmuch as the jury found Breedlove to be credible with respect to those two incidents, and found the defendant

to lack credibility with respect to the November 30, 1995 incident, the defendant has a difficult burden to show that the improper *Secondino* charge so undermined the credibility of his version of the November 25, 1995 incident, as to entitle him to a new trial on the charges arising therefrom.

We are not persuaded that the defendant has satisfied that burden. The defendant's explanation of what occurred on November 25, 1995, is highly implausible; it strains credulity to believe that Breedlove attacked the defendant, both outside Munn's Pub and again as she was on her way home with Cormier, as a way of demonstrating her love for the defendant.[24] More importantly, however, it is very unlikely that the jury, having concluded that the defendant, on two separate occasions, had violated a protective order that Breedlove obtained to protect herself from the defendant, would credit the defendant's claim that Breedlove, in the company of another man, Cormier, attacked the defendant because she still loved him so much.[25]

As we have explained, the trial court abused its discretion in granting the state's motion for a *Secondino* charge.[26] See part II of this opinion. Moreover, under

[24] The defendant's testimony is particularly implausible in light of the fact that he was barred from Munn's Pub and, therefore, had no apparent reason to be in the parking lot on November 25, 1995, other than to confront Breedlove.

[25] The Appellate Court stated that, because the defendant was acquitted of two charges arising out of the November 25, 1995 incident; see footnote 14 of this opinion; the jury did not fully credit Breedlove's testimony. *State v. Young*, supra, 57 Conn. App. 575. We acknowledge that that is one of several possible inferences that reasonably may be drawn from the two findings of not guilty. As the state points out, however, those findings, along with the jury's finding of guilty of the lesser included offense of reckless endangerment in the second degree instead of reckless endangerment in the first degree; see footnote 13 of this opinion; indicate that the improper missing witness instruction was not so harmful as to cause the jury to convict the defendant of all of the crimes with which he was charged.

[26] Although the *Secondino* charge was improper, it is important to note that the court, in instructing the jury, emphasized the fact that the jury was

the circumstances, the assistant state's attorney should not have been permitted, during closing arguments, to draw the jury's attention to the fact that the defendant did not called Martin as a witness.[27] Nevertheless, we conclude that the instruction, when viewed in the context of the entire trial and in the light of the verdicts returned in connection with the charges to which the improper instruction did not pertain, did not affect the result and was not so prejudicial as to undermine confidence in the fairness of the verdict of guilty of the charges arising from the November 25, 1995 incident.

The judgment of the Appellate Court is reversed insofar as it reversed the trial court's judgment of conviction on the charges arising from the November 25, 1995 incident and the case is remanded to that court with direction to consider the defendant's remaining claim.[28]

In this opinion the other justices concurred.

---

*permitted,* and not *required,* to draw an inference that Martin's testimony, if presented, would have been adverse to the defendant.

[27] We also note that, although the assistant state's attorney's argument should not have been permitted, the argument was not expressly couched in terms of an adverse inference.

[28] See footnote 16 of this opinion.