# STATE OF CONNECTICUT *v.* DUANE CLARK
## (SC 16512)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued May 22—officially released July 16, 2002

*Michael O. Sheehan,* special public defender, with whom, on the brief, was *Richard A. Reeve,* special public defender, for the appellant (defendant).

*Rita M. Shair,* senior assistant state's attorney, with whom were *Michael Dearington,* state's attorney, and, on the brief, *Elpedio Vitale,* senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Duane Clark, appealed to the Appellate Court from the trial court's judgment of conviction, following a jury trial, of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c,[1] raising three claims of trial court impropriety. Following the decision of that court affirming the judgment of conviction; *State* v. *Clark,* 62 Conn. App. 182, 184, 774 A.2d 183 (2001); we granted the defendant's petition for certification to appeal, limited to the following issues: "1. Did the Appellate Court properly conclude that the trial court's instruction, limiting the jury's use of the evidence regarding the effect of Leroy Townsend's use of marijuana on his credibility, was proper?"; and "2. If the answer to the first question is 'no,' was the error harmless?" *State* v. *Clark,* 256 Conn. 905, 772 A.2d 597 (2001). We conclude that the Appellate Court improperly concluded that the instruction was proper, however, we further conclude that the errone-

[1] General Statutes § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . . For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction."

ous instruction was harmless. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court set forth the following facts that the jury reasonably could have found. "Tyrese Jenkins, Hopeton Wiggan, David D., Kenny Cloud and Brucie B.[2] were members of a gang named after a housing project in New Haven. On October 7, 1996, at approximately 11:15 p.m., the gang members went to [another] housing project, also located in New Haven and referred to as 'the ghetto,' to settle a dispute with the defendant and [some of his friends].

"Cloud stayed in the car, while Jenkins, Wiggan, David D. and Brucie B., with guns at their sides, went looking for the defendant. The four men entered the housing project through a hole in a fence. As they approached, they noticed the defendant with three others, namely, Charles Green, Bobby 'B.O.' Cook and Ryan Baldwin, who were standing and talking near a green electrical box. When the defendant and the others noticed the gang members approaching, the defendant exclaimed, 'Shoot the motherfucker,' and a gunfight ensued.

"When the first shots were fired, Wiggan and Brucie B. ran for cover behind a dumpster, and Jenkins ran diagonally across a parking lot located in the complex. Both sides exchanged a barrage of gunfire. As Wiggan, Brucie B. and Jenkins retreated from the complex, Jenkins was shot in the leg. He continued to hobble quickly away from the complex until another bullet struck him and he collapsed. Wiggan and Brucie B. went back into the complex and found Jenkins sitting up against a wall. The two picked up Jenkins and carried him to the car. Cloud, David D., Brucie B. and Wiggan took Jenkins to Yale-New Haven Hospital, where he died from his injuries." *State* v. *Clark*, supra, 62 Conn. App. 184–85.

---

[2] The record does not reveal the full identity of David D. or Brucie B.

"Arkady Katsnelson, a forensic pathologist, performed an autopsy on the victim. Katsnelson testified that Jenkins suffered two bullet wounds, one of which was fatal. One bullet, a nine millimeter round, entered the lower front portion of Jenkins' right leg and exited from the back of it. The other bullet, a .44 caliber round, which caused the fatal wound, entered through the upper right side of Jenkins' chest just below his collarbone and then penetrated his chest wall, right lung, heart, diaphragm, part of his liver and organs of his abdomen, and eventually lodged in his abdominal cavity." Id., 185.

The following additional facts and procedural history are necessary for our resolution of the issue on appeal. At trial, the state presented the testimony of its key witness, Townsend, a local man who was standing near the site of the shooting, smoking marijuana, when he witnessed the beginning of the disturbance. Townsend testified that he had seen the defendant at the scene, that the defendant had a pistol and that, immediately prior to the volley of shots resulting in the victim's death, the defendant had said to Green, "Shoot the motherfucker."[3]

Townsend's credibility was attacked by the defense in a variety of ways. He admitted that he had not come forward with his story until several weeks after the shooting when officers from the New Haven police department arrested him for a traffic violation. He also admitted to having three felony convictions on his record. Townsend testified that on the night of the

[3] Following a joint trial with the defendant, the jury found Green guilty of conspiracy to commit murder, murder as an accessory and criminal possession of a pistol or revolver. See *State* v. *Green*, 62 Conn. App. 217, 218, 774 A.2d 157, cert. granted, 256 Conn. 927, 928, 776 A.2d 1147, 1148 (2001) The jury acquitted the defendant of the charges of murder in violation of General Statutes §§ 53a-8 and 53a-54a (a) and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a).

shooting, he went to the housing project to purchase marijuana, although, at other times, he stated that he went there with the marijuana already in his pocket. He testified that at some point he purchased six bags of "weed," although he was unable to remember where he had purchased it. Townsend acknowledged that, shortly before the shooting, he had smoked five marijuana cigarettes, with perhaps a ten or fifteen minute interlude between each cigarette. During his interview with the police, however, Townsend placed himself at the scene for only approximately fifteen minutes prior to the shooting. These inconsistencies aside, the defendant did not inquire into the effect that the marijuana had on Townsend's ability to perceive or to recall the events on the night of the shooting.

Additionally, the defendant cross-examined Townsend regarding the following inconsistencies in his story. Townsend admitted that, although he previously had testified that he had observed Jenkins get shot, he actually did not witness the shooting because he had run from the scene as soon as the shots were fired. He told the police that he had seen the defendant arguing with the victim just before the shooting, but then testified that he had not seen any such argument and only heard about it later. Townsend also had told the police that the shooting took place in a certain tunnel in the housing project, but later testified that it took place on the street. Moreover, Townsend's testimony was inconsistent on the issue of whether the victim and his friends were armed, sometimes indicating that they had guns and, at other times, testifying that they did not. Finally, Sherry Heyward, Townsend's second cousin, testified that she had known Townsend for twenty-five years, had lived with him on occasion, and that he was a "pathological liar."

At the close of evidence, the trial court provided standard instructions regarding the credibility of wit-

nesses[4] and eyewitness identification testimony.[5] Spe-

[4] Specifically, the court's instructions provided: "The credibility of witnesses and the weight to be given to their testimony are matters which are your function to determine. However, I may properly make certain suggestions to you. No fact is, of course, to be determined merely by the number of witnesses testifying for or against it. It is quality, not quantity, of testimony which controls.

"In weighing the testimony of a witness, you should try to size him or her up. You should have in mind all those little circumstances which point to his or her truthfulness or untruthfulness. You should consider any possible bias or prejudice he or she may have whether for or against the state or a defendant, his or her interest or lack of interest of whatever sort in the outcome of the trial, his or her ability to observe facts correctly and to remember and relate them [truthfully] and accurately.

"You should test the evidence he or she gives you by your knowledge of human nature and the motives which influence and control human action. If any facts are admitted or otherwise proved to you, you may bring them into relation with his or her testimony and see if they fit together with it.

"In short, you are to bring to bear upon it the same considerations and use the same sound judgment you apply to questions of truth and veracity which are daily presenting themselves for your decision in the ordinary affairs of life.

"Any conduct or statement of a witness which you find inconsistent with any other conduct or statement of that witness you may consider in weighing the credibility of that witness."

[5] In connection with identification evidence, the court instructed the jury as follows: "Identification is a question of fact for you to decide taking into consideration all of the evidence that you have seen and heard in the course of the trial. The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crimes charged. The identification of a defendant by a single witness as the one who committed the crime is in and of itself sufficient to justify a conviction of such a person provided, of course, that you are satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime.

"In arriving at a determination as to the matter of identification, you should consider all of the facts and circumstances that existed at the time of the observation of the perpetrator by the witness. In this regard, the credibility and the reliability of the witness is of paramount importance since identification testimony is an expression of belief or impression by the witness. Its value depends upon the opportunity and ability of the witness to observe the offender at the time of the event and to make an accurate identification later. It is for you to decide how much weight to place upon such testimony.

"In appraising the testimony given by a witness identifying a defendant as a perpetrator of the crimes charged, you should take into account whether the witness had adequate opportunity and ability to observe the perpetrator

cifically, with regard to Townsend's testimony, the court provided the following instructions to the jury: "In weighing the credibility of . . . Townsend, you may consider the fact that he was convicted of one felony in 1986 and two felonies in 1994, and give such weight to those facts which you decide is fair and reasonable in weighing the credibility of his testimony in court and the statement he gave to the police which is taped and marked as exhibit 50A. Also, in weighing the credibility of . . . Townsend, you may consider the testimony of . . . Heyward concerning her opinion that . . . Townsend is a pathological liar and give such weight to that opinion which you decide is fair and reasonable in weighing his credibility." Nevertheless, earlier in its charge the trial court had stated: "[Y]ou have heard testimony that . . . Townsend smoked marijuana the night of the shooting. There is no evidence as to what effect it had on him. Because there is no such evidence, you must not speculate that he was or was not affected by it or how he was affected by it." The defendant took exception to the court's instruction that the jury essentially must ignore the evidence of Townsend's marijuana use. The court declined, however, to reinstruct the jury.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court's instruction not to consider the effect of Townsend's marijuana use had deprived him of a fair trial and had violated his constitutional right to confrontation. *State v. Clark,*

---

on the date in question. This may be affected by such circumstances as the length of time available to make the observation, the distance between the witness and the perpetrator, the lighting conditions at the time of the events, whether the witness had known or seen the person in the past and whether anything distracted the attention of the witness during the incident.

"You should also consider the witness' physical and emotional condition at the time of the incident and the witness' powers of observation in general. In short, you must consider the totality of the circumstances affecting the identification."

supra, 62 Conn. App. 201. Concluding that "the defendant's cross-examination of the witness was not limited, except by the defendant's own failure to ask the witness about his ability to perceive and to relate events after he had smoked five marijuana cigarettes," the Appellate Court rejected the defendant's constitutional claim. Id., 207 n.11. Accordingly, the Appellate Court treated the claim as an issue of evidentiary propriety, and thereafter concluded that, because the defendant "did not attempt to show that the witness' condition after smoking marijuana affected the witness' ability to observe, to recall or to narrate events at issue in the present case," the trial court's instruction was proper. Id., 211.

In his dissent, Chief Judge Lavery disagreed with the majority's position that, as a predicate to allowing the jury to consider the impact of Townsend's marijuana use on the night in question, there must be evidence of the effects of such drugs on the witness' ability to perceive and to recall. Accordingly, he concluded that the trial court's instruction not to consider this evidence when evaluating Townsend's testimony was improper. Id., 216. In his view, the instructional error was harmful, thereby requiring a new trial. We agree with Chief Judge Lavery's dissent that the instruction was improper, but conclude that the defendant has not demonstrated that the impropriety was harmful.

We begin with a brief recitation of what is *not* at issue in this case. First, it is undisputed that impeachment of a witness by evidence of narcotics use near in time to the events about which the witness testifies is a proper area of inquiry. See *State* v. *Barletta*, 238 Conn. 313, 320–23, 680 A.2d 1284 (1996) (improper for trial court to preclude defense expert from testifying on effects of cocaine on ability to observe and recall). Indeed, most other jurisdictions recognize that intoxication or drug usage, or both, impair a witness' capacity for accurate observations and recall. See generally annot., 65

A.L.R.3d 705 (1975); annot., 8 A.L.R.3d 479 (1966); 2 F. Wharton, Criminal Evidence (15th Ed. 1998) § 9.9. Therefore, the state does not contend that the area of inquiry into Townsend's marijuana usage was improper. Second, the state does not argue that *only* evidence from an expert on the effects of marijuana properly could serve as the predicate before the jury may consider the evidence of drug use. Rather, the state claims that the necessary predicate could have been satisfied had the defendant "ask[ed] Townsend on cross-examination about the effects of the marijuana on his ability to see or recall the events, or [to] recognize the perpetrators."

What *is* at issue in this case, therefore, is whether the defendant's failure to elicit testimony from any witness about the effects of the marijuana on Townsend properly precluded the jury from considering any effects the marijuana may have had on his observations. If we answer that question in the negative, which we do, the next issue is in two parts: (1) whether the trial court's instructions precluding the jury from considering Townsend's marijuana use deprived the defendant of his constitutional right to confrontation or merely constituted an evidentiary impropriety; and (2) whether the impropriety was harmless, the proper test by which that determination is made being controlled by the answer to the preceding question. See *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996) ("[i]f an impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt"); *State* v. *Young*, 258 Conn. 79, 95, 779 A.2d 112 (2001) (when impropriety is nonconstitutional, "defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict").[6]

---

[6] In *State* v. *Young*, supra, 258 Conn. 95, this court noted, without resolving the issue, that there appear to be two standards of review for establishing the existence of harmful error. "One line of cases states that the defendant

I

Our initial inquiry is whether the jury's ability to consider the effects of marijuana use on a witness' ability to observe and relate events is dependent upon specific testimony addressed expressly to that issue. We conclude that Chief Judge Lavery's dissenting opinion in this case properly answered that inquiry in the negative. Chief Judge Lavery first noted: "[T]he effect of alcohol consumption on a witness' ability accurately to observe and later to recall what he observed is an effect which is common knowledge and is an inference which is clearly within the ability of the jurors, as laypersons, to draw based on their own common knowledge and experience. The jury may, without the aid of expert testimony, use the consumption of alcohol as a basis on which to *infer* impairment of ability to observe and recall accurately. . . . *State* v. *Heinz*, 3 Conn. App. 80, 86, 485 A.2d 1321 (1984), citing *D'Amato* v. *Johnston*, 140 Conn. 54, 58, 97 A.2d 893 (1953) (intoxication and its accompaniments are matters of common knowledge)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Clark*, supra, 62 Conn. App. 214.

Chief Judge Lavery also pointed out in his dissent that "the state, on prior occasions, has successfully impeached a witness by inviting the jury to draw inferences from the witness' use of marijuana, a practice our Supreme Court has endorsed." Id., citing to *State* v. *Person*, 215 Conn. 653, 661, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed.

must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) Id. We conclude that the trial court's instruction in the present case constituted harmless error under either standard and, accordingly, we decline to reach the question of the dual standards at this time. See id. (declining to reach issue of dual standards when error is harmless under both).

2d 776 (1991). This court noted in *Person* that the state's attorney had asked questions of a defense witness about his use of marijuana, justifying the line of inquiry as highly relevant in light of the witness' earlier testimony regarding what he had observed and what he had heard. *State* v. *Person*, supra, 661. The court therein termed the state's attempt to raise doubt as to the witness' ability to observe and perceive events, "an entirely permissible subject," a conclusion that we did not predicate on the admission of other evidence. Id.; see also *State* v. *Rodriguez*, 44 Conn. App. 818, 822, 692 A.2d 846, cert. denied, 242 Conn. 902, 697 A.2d 363 (1997) ("[I]t is not necessary for a defendant to present evidence of the effect of an intoxicating substance on him to require an instruction on intoxication and specific intent. The jury is permitted to infer from the fact that an intoxicating substance was ingested that an incapacity to form a specific intent resulted."); *State* v. *Charlton*, 30 Conn. App. 359, 368, 368–69 n.9, 620 A.2d 1297, cert. denied, 225 Conn. 922, 625 A.2d 824 (1993) (approving trial court's instruction that effects of alcohol and marijuana are within jury's common experience); *State* v. *Folson*, 10 Conn. App. 643, 652–53, 525 A.2d 126 (1987) (jury properly may draw inference regarding effects of intoxicating substance on witness' mental state; direct evidence of effects unnecessary). Therefore, it is the existence of the witness' drug use, either at the time of the events in question or at the time of his or her testimony,[7] and not evidence regarding the extent of the concomitant impairment, that serves to place the

---

[7] The cases cited by the state to suggest otherwise are inapposite. They support trial court rulings precluding evidence of drug use where a witness' memory and ability to recall were not at issue; *United States* v. *Mojica*, 185 F.3d 780, 789 (7th Cir. 1999); where drug use was used to launch a general attack on the witness; *United States* v. *Cameron*, 814 F.2d 403, 405 (7th Cir. 1987); where the drug use was not tied to the time of the witness' observations or the time of his testimony; *People* v. *Stiff*, 185 Ill. App. 3d 751, 755, 542 N.E.2d 392 (1989); *Commonwealth* v. *Carrion*, 407 Mass. 263, 273–74, 552 N.E.2d 558 (1990); *Epley* v. *State*, 704 S.W.2d 502, 504 (Tex. App. 1986); or where evidence of habitual drug use, although not connected

issue of the witness' ability to perceive and to recall, and, ultimately, the witness' credibility, before the jury.

We recognize that, because it is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience. *State* v. *Person*, 20 Conn. App. 115, 121, 564 A.2d 626 (1989), aff'd, 215 Conn. 653, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991) ("[c]onsumption of alcohol or drugs obviously can impair an individual's ability to observe and recall accurately"); see also *People* v. *Fauber*, 2 Cal. 4th 792, 839, 831 P.2d 249, 9 Cal. Rptr. 2d 24 (1992), cert. denied, 507 U.S. 1007, 113 S. Ct. 1651, 123 L. Ed. 2d 272 (1993) ("[t]o say . . . that the memory of some of the witnesses may have been affected by drugs is to say no more than the common knowledge that ingestion of drugs affects perception"); *Matthews* v. *State*, 68 Md. App. 282, 289, 511 A.2d 548, cert. denied, 308 Md. 238, 517 A.2d 1121 (1986) ("[i]t is common knowledge that the quantity of alcohol and/or drugs consumed will affect one's ability to see, to hear, and, generally, to perceive what is occurring"). The unfortunate prevalence of marijuana use, coupled with the substantial effort to educate all segments of the public regarding its dangers, underscores the reality that the likely effects of smoking five marijuana cigarettes in a short period of

---

to the day of the incident, was being offered to show impairment, not merely temporary effect. *Bratcher* v. *State*, 743 So. 2d 112, 114 (Fla. App. 1999).

time before an incident are within the ken of the average juror.[8]

The state contends, and the Appellate Court determined, that in order for the jury properly to consider Townsend's drug ingestion, the defendant was required first to question him about his marijuana use and its effect. The primary flaw in this contention is that a denial by Townsend of any effect resulting from his marijuana use would have served no function. In other words, if Townsend, in response to such questioning, had answered that the five marijuana cigarettes that he

[8] In addition to case law, we note that societal realities support Chief Judge Lavery's opinion that "the effects of several marijuana cigarettes are common knowledge." *State* v. *Clark*, supra, 62 Conn. App. 216 (*Lavery, C. J.*, dissenting). Over the past several years, millions of dollars of state, federal and private funds have been expended on informing the public of the dangers and the impact of marijuana use. The following basic information exemplifies what is readily available on the internet and in various print media: "Effects of smoking [marijuana] are generally felt within a few minutes and peak in [ten] to [thirty] minutes. They include dry mouth and throat, increased heart rate, impaired coordination and balance, delayed reaction time, and diminished short-term memory. Moderate doses tend to induce a sense of well-being and a dreamy state of relaxation that encourages fantasies, renders some users highly suggestible, and distorts perception (making it dangerous to operate machinery, drive a car or boat, or ride a bicycle). Stronger doses prompt more intense and often disturbing reactions including paranoia and hallucinations." American Council for Drug Education, "Basic Facts About Drugs: Marijuana," (1999) at http://www.acde.org/youth/Research.htm; see also National Institute of Drug Abuse, "Marijuana: Facts for Teens," (November, 1998) at http://www.nida.nih.gov/MarijBroch/Marijteenstxt.html ("short-term effects of marijuana include: problems with memory and learning; distorted perception [sights, sounds, time, touch]; trouble with thinking and problem-solving; loss of coordination; and increased heart rate, anxiety"). Moreover, surveys of marijuana use show a significant percent of the public has used marijuana at least once by the time they are in twelfth grade. See, e.g., National Institute of Drug Abuse, "Marijuana, Other Drug Use Among Teens Continues to Rise," (March/April 1995) at http://www.nida.nih.gov/NIDA_Notes/NNVol10N2/Marijuanateens.html ("[i]n 1979, for example, 50.8% of [twelfth] graders had tried marijuana in the past year, and every year from 1975 through 1985, the percentage of [twelfth] graders who had smoked marijuana at least once in the year before the survey was more than 40 percent"; for 1994, the number was 30.7 percent of twelfth graders).

had smoked shortly before the incident in question had no effect on his perceptions, there would be no more evidence before the jury than if the question had not been asked. *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985) (denial is not affirmative evidence of disputed fact).

The second flaw with imposing this condition in the present case is that it works an *unfair* prejudice to the defendant. Because the trial court, sua sponte, told the jury in its final instructions to disregard the evidence of Townsend's marijuana use, the defendant essentially was precluded from offering *any* evidence, including expert testimony, which the state concedes would have been proper, to substantiate that marijuana, classified medically as a hallucinogen, affects an individual's perceptions. Accordingly, we conclude that the Appellate Court's determination approving the trial court's instruction, which precluded the jury's consideration of evidence regarding any effect that Townsend's use of marijuana may have had on him, was improper.

II

In light of our conclusion, we next must consider whether the trial court's instructions precluding the jury from considering the effects of Townsend's marijuana use on the night of the incident violated the defendant's constitutional rights, or whether the impropriety was merely of an evidentiary nature. Our law in this regard is well settled. "The right of an accused to effectively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment." (Citations omitted; internal quotation marks omitted.)

*State* v. *Asherman*, 193 Conn. 695, 718, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). "The constitutional standard is met when defense counsel is 'permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' " *State* v. *Gaynor*, 182 Conn. 501, 509, 438 A.2d 749 (1980), quoting *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant *must* be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. *State* v. *Morant*, 242 Conn. 666, 682, 701 A.2d 1 (1997). The defendant's right to cross-examine a witness, however, is not absolute. *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985) ("[e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error"). Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion; *State* v. *Gaynor*, supra, 509–10; in which case, in order to prevail on appeal, the defendant must show that the restrictions imposed upon the cross-examination were clearly prejudicial. *State* v. *Chapman*, 229 Conn. 529, 544, 643 A.2d 1213 (1994).

In the present case, we are concerned with the reliability of Townsend's testimony, which is impacted by a wide range of issues. See generally C. Tait, Connecticut Evidence (3d Ed. 2001) § 6.28, p. 450. "The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. If as a result of a [particular] condition such capacity has been substantially diminished, evidence

of that condition before, at and after the occurrence and at the time of trial, is ordinarily admissible for use by the trier in passing on the credibility of the witness." (Internal quotation marks omitted.) *State* v. *Cardinal*, 194 Conn. 114, 118–19, 478 A.2d 610 (1984). It is particularly important that "facts bearing on [a witness'] reliability, credibility, or sense of perception" are explored. *State* v. *Ambrosia*, 212 Conn. 50, 57, 561 A.2d 422 (1989).

We already have concluded that the admission of evidence of Townsend's drug use to impeach the reliability of his testimony was proper and that the instruction to disregard that evidence essentially denied the defendant meaningful access into a legitimate area of inquiry. Whether that impropriety violated the constitutional protection of the confrontation clause depends, however, upon a variety of factors. "[W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992).

We begin by noting that the defendant effectively cross-examined Townsend, during which time he was able to expose numerous inconsistencies in Townsend's account of the incident. For example, as noted previously, there were inconsistencies between what Townsend had told the police and what he had related at trial regarding whether he had seen or heard the argument between the defendant and the victim, where the shooting had occurred and which men had been armed. In addition, his testimony regarding when and where he had purchased and smoked the marijuana was inconsistent. Indeed, Townsend's cousin, Heyward, who had known him for twenty-five years, described him as a "pathological liar." Townsend's prior felony record also was introduced as a basis on which to

impeach his credibility. Finally, he was questioned about his possible motive for testifying falsely, including the fact that he was being held in jail because of his earlier attempt to avoid the state's subpoena. These various credibility issues, as well as others, also were highlighted for the jury during the defendant's closing arguments.[9] Accordingly, the defendant exposed numerous facts from which the jury could have concluded that Townsend's testimony was unreliable, and, hence, not credible.

We recognize that Townsend's marijuana use could have impacted his ability to perceive accurately the events in question and that, by virtue of the trial court's instructions, any such effect was eliminated from the jury's consideration. Consequently, the defendant argues that, by eliminating the evidence of marijuana use in this manner, the possible inability of Townsend to perceive accurately was not exposed. In this case, however, other than questioning Townsend about his drug use, the defendant made little use of this evidence. Indeed, prior to the trial court's limiting instruction, the defendant, during summation, cited Townsend's testimony concerning marijuana use merely to point out additional inconsistencies throughout his testimony;

---

[9] The defendant, in his closing argument, pointed out the following inconsistencies in Townsend's testimony. Townsend testified that he had gone to the housing project to buy marijuana, that he had bought six nickel bags there, that he had rolled six marijuana cigarettes, five of which he smoked over a period of approximately eighty minutes before the shooting incident in question. Townsend had told the police, however, that he had been at the housing project for only ten to fifteen minutes. At other times, Townsend testified that he had not purchased marijuana in the housing project, but that he already had some in his pocket before going there. Townsend contradicted himself about the route that Jenkins and his friends had taken. He could not remember the names of people he had known for years, nor could he remember his sister's address in the housing project, despite her fifteen year association with the complex. Townsend's testimony regarding the shooting, where everyone stood in relation to one another, the argument that preceded the shooting and the orders given to shoot also was inconsistent.

see footnote 9 of this opinion; and thereby test his credibility, not to argue that such drug use, in and of itself, adversely affected his ability to perceive. In other words, it was the defendant's claim that Townsend was *lying* about the defendant's involvement in the crime, not that Townsend misperceived the events. Therefore, this testimony, as used, essentially added little to discredit Townsend's testimony beyond what had been established by the other inconsistencies developed through the defendant's thorough and effective cross-examination.

Under all the circumstances of this case, we conclude that the constitutional standard has been met, and, therefore, that the trial court's improper instruction to the jury was merely an evidentiary impropriety. Accordingly, in order to prevail on appeal, the defendant must show that the restrictions imposed by the trial court were harmful. *State* v. *Chapman*, supra, 229 Conn. 544. In order to do so, the defendant must establish that the impropriety was "so prejudicial as to undermine confidence in the fairness of the verdict . . . ." *State* v. *Young*, supra, 258 Conn. 101. We conclude that the defendant has not satisfied this burden.

The defendant points to two facts in support of his claim of harm. First, Townsend was the only witness to place the defendant at the scene of the shootings and, second, his testimony placed in the hands of the defendant a nine millimeter semiautomatic pistol, one type of weapon that was fired at the scene. It is undisputed, however, that Townsend had known the defendant for several years, thereby eliminating the likelihood of mistaken identity. Additionally, the jury acquitted the defendant of murder and conspiracy to commit murder; see footnote 3 of this opinion; thereby undermining any claim that the jury needed the excluded evidence in order properly to discount Townsend's testimony. Furthermore, we note that ballistics

evidence corroborated Townsend's testimony that a nine millimeter weapon had been used.[10] Most importantly, however, the defendant never sought to establish that Townsend's testimony was not credible because Townsend's marijuana use impaired his ability to perceive the events; rather, the defendant attempted to prove that Townsend was not being truthful about the defendant's involvement in the crime. In light of these facts, therefore, we conclude that the defendant has failed to prove that the trial court's instruction was so prejudicial as to undermine confidence in the fairness of the verdict. Accordingly, we concur with the judgment of the Appellate Court, albeit on different reasoning.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[10] It was undisputed that one bullet, a nine millimeter round, had entered the lower front portion of Jenkins' right leg and exited through the back of it. Additionally, police on the scene shortly after the shooting recovered eleven nine millimeter cartridge casings, all fired from the same nine millimeter gun, as well as two nine millimeter bullets that had been fired from a second gun.