Filed 2/28/14  Koopen v. Aberle CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JEFF KOOPEN, an Incompetent Person, etc., <br><br>　　　Plaintiff and Appellant, <br><br>v. <br><br>RICK ABERLE, <br><br>　　　Defendant and Respondent. | A135978 <br><br> (Alameda County <br> Super. Ct. No. HG06266136) |

Plaintiff Jeff Koopen was seriously injured when a motorboat in which he was riding, piloted by defendant Rick Aberle, hit a low-lying island.  Following a trial, the jury found Aberle negligent, but it assigned him only 35 percent responsibility for the accident.  Koopen was assigned 10 percent responsibility, while another participant was assigned 55 percent responsibility.  Koopen contends the trial court erred in striking evidence of Aberle's marijuana use and argues the jury erred in finding him partially responsible.  We affirm.

## I.  BACKGROUND

Koopen, by his guardian ad litem, filed suit against Aberle and Collin Troia in April 2006, asserting a single claim for negligence in connection with a boating accident.  Before the action could proceed to trial, in July 2009, Aberle filed for bankruptcy, subjecting the action to an automatic stay.  Troia filed for bankruptcy the following year.

At some point, the bankruptcy court "remanded several issues back to the superior court for determination via civil trial," and the trial court set a December 2011 trial date.[1] Koopen's attorney told the trial court that the bankruptcy court anticipated "the jury in the state court action would be asked to determine if [Aberle] had operated the boat while intoxicated." The issue of intoxication is apparently relevant to whether the judgment in this matter is dischargeable in bankruptcy, and a finding on the issue might preclude the need for a trial on the issue in that court. Although the trial court viewed such a finding as extraordinary, it granted Koopen's request for a special verdict form addressing the issue.

The case proceeded to trial only against Aberle.[2] The evidence showed that Koopen, Aberle, Troia, and several other friends rented a houseboat for use on New Melones Lake, a reservoir in Calaveras County, over a weekend in September 2005. The three parties arrived in the late afternoon on a Friday. They piloted the houseboat from the marina to a cove mooring some distance away, trailed by motorboats owned by Aberle and Troia. Thereafter, these two and one other motorboat were used to ferry other guests, who arrived throughout the evening, from the marina to the houseboat. As many as 20 to 25 people ultimately arrived. During their boating on the reservoir that day, both Troia and Aberle had noticed the water level was "pretty low."

Sometime after 9:30 p.m., the houseboat received word that the last group of guests had arrived at the marina. Troia's motorboat was selected to retrieve these guests. It was unclear who chose the boat, but it was not Aberle, who joined the group as the boat was pulling away. Troia recalled his boat was chosen from among three available motorboats because it was the last one in the tie-up line, and thus the easiest of access, but another witness recalled that a different boat was initially selected but would not start.

---

[1] The characterization of the bankruptcy court's action is from an attorney's declaration. We have not found a copy of the relevant bankruptcy court order in the appellate record.

[2] We have not found an explanation for Troia's failure to participate as a party at trial.

Troia's motorboat was an "average" 17- or 18-foot, inboard/outboard boat, equipped with standard safety equipment, including bow and stern low-wattage navigational lights, but it did not have a spotlight for nighttime boating. The other two boats did have spotlights, although one of them was not working. Troia said it was not unusual to drive at night without a spotlight, and he did not think one was necessary that night. Because a spotlight can cause glare, it was not necessarily helpful.

Koopen was the first pilot. He steered Troia's motorboat toward the boat ramp, accompanied by Troia, Aberle, and four others. It was well after dark, and memories varied about the degree of moonlight. The shoreline and the mountains surrounding the lake were visible, and the boat was well away from shore. Soon after departure, Aberle replaced Koopen at the helm. One witness recalled Koopen was replaced because he gunned the throttle while several passengers were urinating over the side, dumping one passenger into the water. Others had no memory of the reason for Koopen's replacement. In any event, Koopen joined Troia in the front of the boat.

Aberle was an experienced, lifelong boat pilot. Without incident, he had made the same trip to the marina in the dark perhaps an hour earlier to pick up his daughter and her friends. Aberle drove slowly from the cove, sitting on top of the driver's seat to allow a better view. When the lights of the marina appeared across the lake, he accelerated toward them. The boat reached between 20 and 30 miles per hour, which caused it to "plane," or level out on the water, allowing better visibility.

Aberle drove on a straight course for less than five minutes, perhaps as few as two. Without warning, the boat hit a low, unlighted island, ejecting Koopen and Troia. Koopen was gravely injured.

An investigating law enforcement officer testified that the "island" struck by the boat was part of a mountain ridge that had been flooded when the reservoir was created. Depending on the level of the water in the reservoir, the island could be entirely submerged or, at the other extreme, part of the shoreline. At the time of the collision, the end of summer, the reservoir was seasonally low, exposing a "small" island that projected, at its peak, 10 feet above the water. The officer testified a county ordinance

limited nighttime driving to 15 miles per hour, but the officer estimated the safe speed under the conditions that night to be 8 to 10.

The officer used a spotlight on the night of the accident to locate the island. Two buoys marked its location. At the time of the accident, they were laying on the island, but they had reflective markings that might have been visible if illuminated. The officer believed the island should have been visible on the night of the accident from a distance of 75 feet even in the dark, but none of the boat's occupants saw it prior to the collision.

The bar on the houseboat had been "well-stocked." During his time at the lake, Troia estimated he had drunk between two and three beers. Koopen had also been drinking. Aberle said he had three to four drinks of vodka mixed with an energy drink between 6:00 p.m. and the time of the trip. He drank the most recent around 9:00 p.m. The exact composition of these drinks was subject to conflicting testimony. Aberle denied any other drinking, but other witnesses had different, conflicting recollections.[3]

The court permitted questioning about Aberle's marijuana use that night, subject to a motion to strike. Aberle acknowledged a blood test performed on him after the accident found evidence of marijuana, but he did not recall consuming it. One witness testified to seeing Aberle take one puff from a marijuana cigarette around 8:00 p.m. and one puff from a marijuana-filled pipe sometime later. A second witness said Aberle had smoked marijuana on the drive to the lake, and she saw him smoking marijuana at the lake "[m]aybe" two hours before the accident. She was not asked for, and did not provide, an estimate of the amount of marijuana he consumed on either occasion. The trial court ultimately granted the motion to strike this testimony under Evidence Code section 352 because no evidence had been presented "that indicates what the effect of marijuana is on the human body, . . . let alone on the central nervous system, . . . ability to perceive and react, ability to deal with eye[-]hand coordination, et cetera." In addition, as the court noted, there was only vague evidence about the amount of marijuana Aberle

_____

[3] Aberle's blood-alcohol level was measured at 0.03 percent nearly four hours after the accident. Evidence of the blood-alcohol test was stricken by the trial court because no expert testimony had been provided as to its reliability and significance.

consumed and the time of its consumption. The court rejected the argument that the jurors could gauge the effect from their common experience, based on this limited evidence.

The jury concluded Aberle was not intoxicated at the time of the accident, but it found him liable for negligence. Both Koopen and Troia were also found negligent, and the jury assigned comparative liability at 35 percent for Aberle, 10 percent for Koopen, and 55 percent for Troia.

## II. DISCUSSION

Koopen contends the trial court abused its discretion in striking the testimony of Aberle's marijuana consumption and the jury erred in finding Troia and Koopen comparatively negligent.

### A. *Marijuana Evidence*

"The trial court enjoys 'broad authority' over the admission and exclusion of evidence. [Citation.] We review a trial court's ruling on a motion in limine to exclude evidence for an abuse of discretion. [Citations.] . . . Furthermore, '[i]t is for the trial court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. The appellate court may not interfere with the trial court's determination . . . unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice.' " (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295–296.)

Under the general rules governing the admission of expert testimony, topics which are within the common knowledge of jurors and on which people of ordinary education could reach a conclusion as well as the expert, may not be a subject of expert testimony. Conversely, when an expert's view might be helpful, expert testimony may be admitted, and when a matter cannot be understood without an expert's help, such testimony must be introduced and admitted. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 844; *Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 761–762.) While the issue here is somewhat different, these principles provide a useful guide in considering

the question before the trial court: whether the evidence of Aberle's intoxication was more prejudicial than probative in the absence of expert testimony to explain it.

With respect to the effects on behavior of intoxicating substances other than alcohol, the Supreme Court has often required expert testimony, either on the effects of the substance or on the degree to which those effects are common knowledge. (See, e.g., *People v. Harris* (1981) 28 Cal.3d 935, 958 [marijuana]; *People v. Frierson* (1979) 25 Cal.3d 142, 156 [Quaalude and angel dust].) To demonstrate impairment by marijuana under the Vehicle Code, for example, more than evidence of consumption must be presented. Instead, the prosecution must provide expert testimony or other evidence showing "actual impairment rather than how much time has passed since a person has smoked marijuana." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 768.) California courts have not, however, adopted any hard-and-fast rule, applicable in all circumstances, regarding the need for expert testimony of the effects of marijuana consumption.

In evaluating the trial court's decision under Evidence Code section 352, we start with the assumption that the effects of marijuana, as with those of alcohol, vary with the amount consumed, the potency of the particular marijuana, and the time since consumption. Here, there was no evidence presented regarding the nature of the marijuana consumed by Aberle and very limited evidence about the amount and timing. One witness said Aberle consumed what would appear to be a relatively minimal amount, two separate puffs over a period of two or three hours, with the last puff of uncertain timing relative to the accident. The second witness said Aberle had smoked an unspecified amount of marijuana on the drive up, presumably a minimum of six hours before the accident, and a further unspecified amount of marijuana perhaps two hours before the accident. Whether this second event of consumption was identical to the consumption described by the first witness, or represented additional consumption, is unknown. In other words, the evidence on the critical aspects of potency, amount, and timing was very uncertain. Even an expert would have had to speculate in determining

6

whether and to what degree the marijuana affected Aberle. The vagueness of the testimony alone might have justified its exclusion.

Further, it is important to remember, as the trial court noted in its ruling, that evidence of Aberle's marijuana consumption was relevant only to the extent the consumption affected his judgment, reactions, and motor control at the time of the accident. The jury was not asked to consider the mood-altering effects of marijuana, which might be common knowledge, but the more specific question of the likely impact of its consumption on Aberle's piloting ability. It is by no means plain that this aspect of marijuana consumption is within the common knowledge of jurors. Until fairly recently, consumption of the drug has been illegal in California, and it remains illegal for those who lack a medical prescription. Some jurors likely have had no personal experience with the drug's consumption, let alone its effects on reactions and motor skills. For many jurors who have consumed the drug at one time in their lives, their exposure occurred in their youth. Their experience and memories likely focused on the drug's mood-altering effects, rather than its impact on their driving skills. There is no reason to assume, in the absence of some evidence, that typical jurors have common knowledge of the manner in which various levels of marijuana consumption affect motor skills. Particularly given the vagueness of the testimony about Aberle's precise consumption, we have no hesitation in finding the trial court's decision to preclude the jury from speculating on the likely impact of his marijuana consumption in the absence of expert guidance to be well within its discretion.

The decision on which Koopen places heaviest reliance, *State v. Clark* (2002) 260 Conn. 813 [801 A.2d 718] (*Clark*), highlights the fact-specific nature of any decision regarding the admission of evidence of marijuana consumption. In *Clark,* the issue was whether the jury could consider the likely impact of a witness's consumption of marijuana on his ability to perceive events in the absence of any direct testimony, expert or lay, of the drug's effects on him. The witness said he had smoked five marijuana cigarettes within the space of perhaps 90 minutes prior to observing a gunfight in which he was not directly involved. (801 A.2d at pp. 720–723.) In concluding the jury was

allowed to consider his marijuana consumption in assessing his reliability, the court relied on the general rule that a jury is ordinarily permitted to infer, solely based on the fact that an intoxicating drug was ingested, that the witness's perceptions might be affected. (*Id.* at p. 725.) Regarding the issue of common knowledge, the court noted, "We recognize that, because it is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience. [Citations.] The unfortunate prevalence of marijuana use, coupled with the substantial effort to educate all segments of the public regarding its dangers, underscores the reality that the likely effects of smoking five marijuana cigarettes in a short period of time before an incident are within the ken of the average juror." (*Id.* at pp. 725–726, fn. omitted.)

The issue in *Clark* was whether a jury could draw on common knowledge to evaluate the effect of the consumption of a substantial quantity of marijuana in a relatively short time on a witness's ability to perceive events accurately. This is quite different from the question posed here: whether the jury could draw on common knowledge to evaluate the effect of a person's consumption of an uncertain quantity of marijuana at uncertain times on his subsequent ability to pilot a boat. In addition to the difference in the specificity of the amount and timing of consumption, the questions involve two quite different neurological functions. Even assuming common knowledge could be brought to bear in the circumstances of *Clark*, a trial court could reasonably conclude it could not in our circumstances.

Koopen argues evidence of Aberle's marijuana consumption was relevant to the factual issue of intoxication. He urges us to remand for a new trial on that issue alone, in the event the judgment itself is not reversed. We decline to do so. Special verdict forms

ordinarily include jury interrogatories only on ultimate facts—those which are essential to proving the cause of action. (See *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 959; *Leyte-Vidal v. Semel* (2013) 220 Cal.App.4th 1001, 1009–1010 [defining "ultimate fact"].) The conclusion that a particular factual finding is not supported by the evidence therefore requires reversal of the judgment on the cause of action. Here, the inclusion of the question about intoxication was extraordinary because, unlike the jury's findings of negligence and causation, the fact of Aberle's intoxication was not an element of Koopen's claim. As the trial court noted in permitting Koopen's requested jury interrogatory, a finding on the issue of intoxication was included in the verdict form only as, in effect, a favor to the bankruptcy court.

Even if we were to review the finding on intoxication, conclude it was erroneous, and vacate it, we would have no power to order a new trial with respect to the issue because its reversal would not affect the judgment. It goes without saying that recognized forms of state court proceedings do not include the trial of an isolated fact, independent of a cause of action or other right to relief.[4] From the perspective of this court, the issue is therefore moot. (See *Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503 [appeal is moot if court can grant no effective relief].) The legal significance of the finding of no intoxication and the weight to be afforded it in bankruptcy court are matters to be determined by that court. We therefore decline to review the jury's finding regarding intoxication.[5]

**B.** *Allocation of Fault*

Given the subjective nature of the allocation of responsibility for an accident, our review of a jury's comparative liability findings is limited. "The comparative fault

---

[4] The primary authority Koopen cites on this issue, *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, addresses the court's power to grant a partial verdict on some causes of action while granting a retrial as to other causes of action. (*Id.* at pp. 1477, 1479.) We know of no authority permitting retrial of a *fact*.

[5] Koopen also asks us to direct the bankruptcy court to conduct a new trial of the issue, but we have no authority to tell a federal bankruptcy court how to do its job.

doctrine 'is designed to permit the trier of fact to consider all relevant criteria in apportioning liability.  The doctrine "is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury . . . , in order to arrive at an 'equitable apportionment or allocation of loss.' " [Citation.]' [Citation.]  For this reason, comparative negligence 'does not lend itself to "the exact measurements of a micrometer-caliper." ' [Citation.] . . . [¶] . . . [¶] We review [the jury's allocation of fault] for the existence of substantial evidence.  [Citation.]  On review for substantial evidence, we 'consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment.  [Citation.]' [Citation.]  Under this standard, ' "the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment.  [Citation.]" ' [Citation.]  For this reason, courts rarely disturb the jury's apportionment of fault." (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1285–1286.)

The jury's verdict suggests that it concluded there were two separate acts of negligence that contributed to the accident.  The finding of negligence against Aberle indicates the jury found his speed to be excessive for the conditions that night, consistent with the testimony of the investigating officer.  The jury could readily have concluded that, if Aberle had been traveling more slowly, he or someone else aboard the boat might have noticed the island in time for it to be avoided.  Even if that had not occurred, a slower speed almost certainly would have reduced the severity of Koopen's devastating injuries.  The jury's finding against Troia and Koopen indicates it also found the decision to use a boat that lacked a spotlight to constitute negligence.  As all conceded, it was dark that night, and by traveling without a spotlight the boat was traveling blind.  Even if an obstruction had been spotted, the lack of a spotlight greatly reduced the chance of seeing it in time to avoid a collision.  Further, as the officer testified, potential obstacles like the island are commonly marked by buoys with reflective markings.  Without a spotlight to provide reflected light, reflective buoys cannot serve their intended purpose.  Given

10

Koopen's initial pilotage of the boat, the jury could have inferred that Koopen was partially responsible for the use of a boat lacking a spotlight. The trial record therefore provides substantial evidence to support a finding of negligence by all three parties.

Koopen argues the decision to leave without a spotlight could not have constituted negligence because a spotlight is not legally required equipment for this type of boat. Koopen cites no authority for his contention that compliance with the regulations governing the equipment required for motorboat operation provides a complete defense against liability for negligence, and the rule appears to be to the contrary. "Courts have generally not looked with favor upon the use of statutory compliance as a defense to tort liability. The Restatement Second of Torts summarizes the prevailing view in these terms: 'Where a statute, ordinance or regulation is found to define a standard of conduct for the purposes of negligence actions, . . . the standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them.' " (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 547–548.) As the jury found, a reasonable person would have taken additional precautions before piloting a motorboat on this dark night. While Troia testified that a spotlight can sometimes be counterproductive as a result of glare, the investigating officer said that he located the island that night by using a spotlight. This testimony demonstrated that, whatever the occasional drawbacks of a spotlight, on that particular night the use of a spotlight might have illuminated the island and prevented the accident.

Koopen also contends he could not be found negligent because he owed no duty to Aberle, citing *Monreal v. Tobin* (1998) 61 Cal.App.4th 1337. The plaintiff in *Monreal* was driving at the speed limit in one of the center lanes of a four-lane highway when he was struck from behind by the defendant's speeding car. The trial court found the plaintiff partially liable for the accident because he failed to move over to the adjoining lane to make room for the defendant's car. (*Id.* at pp. 1341, 1342–1343.) The Court of Appeal reversed, concluding a person who is driving in one of the center lanes of a

highway at the speed limit has no legal duty to move over for an oncoming car traveling in excess of the speed limit. (*Id.* at pp. 1350–1355.) The two situations are simply not comparable. Under ordinary tort principles, Koopen, as the initial pilot of the boat, had a duty to the passengers and any subsequent pilot to ensure the boat was properly outfitted before taking it on the water.

Koopen also argues Aberle's speeding was a superseding cause that relieved him of liability. " '[T]he term "superseding cause" means "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." ' " (*In re Ethan C.* (2012) 54 Cal.4th 610, 641 (*Ethan*).) " 'The problem which is involved in determining whether a particular intervening force is or is not a superseding cause of the harm is in reality a problem of determining whether the intervention of the force was within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part at least, to protect the other from the hazard of being harmed by the intervening force, or by the effect of the intervening force operating on the condition created by the negligent conduct, then that hazard is within the duty, and the intervening force is not a superseding cause.' " (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725 (*Lugtu*).)

The purpose for a spotlight was to detect obstacles not otherwise visible in the dark. Aberle's speed did not change the likelihood of encountering unseen obstacles; it merely intensified the risk associated with it. By giving advance warning of an obstruction, a spotlight would have given Aberle an opportunity to alter course before hitting the island. Use of a spotlight therefore would have, at least in part, " 'protect[ed] . . . from the hazard of being harmed by the intervening force.' " (*Lugtu, supra,* 26 Cal.4th at p. 725.) Accordingly, there is no basis for concluding that it is " ' "unfair to hold [Koopen] responsible" ' " for the accident. (*Ethan, supra,* 54 Cal.4th at p. 641.)[6]

---

[6] Koopen contends the speed of the boat was such that, even with a spotlight, there would have been no time to swerve, but there is no evidence in the record to support this contention.

Citing *Schrimscher v. Bryson* (1976) 58 Cal.App.3d 660, Koopen argues Aberle's speeding was a superseding cause because it was not foreseeable. The plaintiff in *Schrimscher* was a police officer who had stopped to investigate a traffic accident caused by the negligence of the defendant. Both the defendant's and the officer's vehicles were parked off the highway. In the course of the investigation, a drunk driver swerved off the highway and hit the defendant's vehicle, which was propelled into the plaintiff officer. (*Id.* at pp. 662–663.) Applying the standard for superseding cause prevalent at the time, the court found the defendant not liable because the second driver's negligence in swerving off the road was " 'highly unusual or extraordinary,' " and therefore not foreseeable. (*Id.* at p. 664.) As the above discussion suggests, the legal standard for superseding cause has evolved somewhat in the nearly 40 years since *Schrimscher*. Yet even accepting the terms of *Schrimscher*, we could not say as a matter of law that Aberle's conduct was not foreseeable. Speeding is a common, and therefore foreseeable, form of negligence in the use of motorized modes of transportation.

Koopen also argues Aberle's speeding was a superseding cause because, had the boat been traveling at a safe rate of speed, no harm would have occurred. While the severity of injuries almost certainly would have been less from a collision at 10 miles per hour, there was no evidence to support Koopen's contention no injuries would have resulted. More important, the issue in evaluating a superseding cause is not whether no harm would have occurred in the absence of the alleged superseding cause. Rather, the issue is whether the superseding cause was so unrelated to the original negligence that the original negligence had little practical relation to the accident. As suggested above, Koopen's negligence compounded the risk from Aberle's speeding.

Finally, Koopen contends the jury's assignment of only 35 percent fault to Aberle was not supported by the evidence. As discussed above, our review of the jury's decision on this issue is limited to a determination of reasonableness. While Aberle's speeding certainly increased the severity of the accident, it was the lack of a spotlight that virtually guaranteed the pilot of the boat would have little or no advance warning of an obstacle. With a spotlight, the accident might have been avoided altogether. For this reason, the

13

jury's assignment of 65 percent responsibility to the persons responsible for the lack of a spotlight was not unreasonable.

## III.  DISPOSITION

The judgment of the trial court is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Becton, J.[*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.